UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| REX ALLEN PENLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:14-CV-00111 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Rex Allen Penland appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Penland applied for DIB and SSI in March 2011, alleging disability as of January 22,

2009. (Tr. 158-72.) The Commissioner denied Penland's application initially and upon

reconsideration. (Tr. 79-97.) After a timely request (Tr. 98-100), a hearing was held on July 18,

2012, before Administrative Law Judge ("ALJ") Jennifer Fisher, at which Penland, who was

represented by counsel, and a vocational expert ("VE") testified (Tr. 36-70). On September 27,

2012, the ALJ rendered an unfavorable decision to Penland, concluding that he was not disabled

because he could perform a significant number of unskilled jobs in the economy despite the

---

[1] All parties have consented to the Magistrate Judge. (Docket # 16); *see* 28 U.S.C. § 636(c).

limitations caused by his impairments. (Tr. 19-31.)  The Appeals Council denied his request for

review (Tr. 10-12), at which point the ALJ's decision became the final decision of the

Commissioner. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §§ 404.981,

416.1481.

Penland filed a complaint with this Court on April 9, 2014, seeking relief from the

Commissioner's final decision. (Docket # 1.)  In this appeal, Penland alleges that the ALJ: (1)

incorrectly concluded at step three that his impairments did not meet or equal Listing 12.05C,

intellectual disability (formerly titled mental retardation); and (2) improperly rejected the

opinion of consultive examiner Cathy Strack, M.S., L.M.H.C., which was countersigned by

Kenneth Bundza, Ph.D.[2] (Social Security Opening Br. of Pl. 6-16.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Penland was fifty-two years old (Tr. 321); had an

eighth or ninth grade education with special education classes (Tr. 25, 42-43, 195, 210, 262); and

---

[2] Also before the Court is Penland's Motion to Strike Defendant's Amended Memorandum in Support of the Commissioner's Decision. (Docket # 23.)  As background, the Court set a November 14, 2014, deadline for the filing of the Commissioner's response brief, which was later extended to December 12, 2014. (Docket # 14, 20.)  The Commissioner filed its response brief on December 8, 2014, four days before the deadline (Docket # 21); then two days later, on December 10, 2014, the Commissioner filed an amended response brief (Docket # 22).

 Penland argues that the Court should strike the Commissioner's amended response brief because it was filed without leave of Court or consent of Penland's counsel.  But "motions to strike are disfavored." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  The Commissioner urges that it filed the amended brief just two days after filing the original brief, which was still two days before the relevant deadline, for the purpose of correcting errors to prevent "the Court from wasting time addressing an erroneous argument." (Docket # 24.)

 Considering the disfavor with which motions to strike are met in this jurisdiction, and that the Commissioner filed its amended brief before the deadline, the Court exercises its discretion by allowing the Commissioner's amended response brief to stand. *See, e.g.*, *Patterson v. Indianapolis Star*, No. 105cv881, 2005 WL 2373830, at *2 (S.D. Ind. Sept. 27, 2005).  Accordingly, Penland's motion to strike will be DENIED.

[3] In the interest of brevity, this Opinion recounts only the portions of the 321-page administrative record necessary to the decision.

had work experience as a maintenance worker, factory worker, cook, and stocker (Tr. 195-96, 211). At the time of the hearing, he had recently started working as a Walmart greeter thirty hours per week. (Tr. 51.) He alleged on his written application that he became disabled due to emphysema and high blood pressure. (Tr. 210.) Because Penland does not challenge the ALJ's findings about his physical condition, the Court will focus on the evidence pertaining to his mental limitations.

## B. Penland's Testimony at the Hearing

At the hearing, Penland testified that for the past eight years he has lived with his wife, but prior to that he lived alone. (Tr. 55-56.) He stated that he has difficulty with reading, writing, and math; more particularly, he has problems reading a newspaper and often relies on the pictures, but can read notes from his wife. (Tr. 43-45, 67-68.) He knows how to drive, but does not have a driver's license because he could not pass the written exam. (Tr. 43-44, 54.) His wife completes job applications for him and completed his disability application. (Tr. 44.) He explained that he quit school in the eighth or ninth grade and sought work to help support his parents after his father was injured. (Tr. 43.)

When living alone, Penland was independent with his self care, shopping, and household tasks, except that his sister helped him write checks and pay bills. (Tr. 55-56.) He primarily relied on walking for transportation, but his siblings or landlord drove him places when needed; at the time of the hearing, he was in the process of obtaining a moped for transportation. (Tr. 57.)

Penland recently started working as a Walmart greeter thirty hours a week at the store where his wife is employed. (Tr. 45-46.) He quit a part-time job unloading trucks at the Dollar

Tree for the Walmart position; he was let go from a previous job at a doughnut shop because of difficulty breathing in the hot environment. (Tr. 46, 50, 53.) He also worked various other jobs in the past, including five years of maintenance at Ramada Inn; he stated that he had no problems performing that job and was let go due to a change in management. (Tr. 47-49.) At several of his past factory jobs, his wife or another coworker occasionally helped him when he got behind. (Tr. 57-58, 68.) When asked what prevented him from working now, he stated that he had developed emphysema and high blood pressure and gotten glasses, and his long-term difficulty with reading and math. (Tr. 51.)

### C. Summary of the Relevant Medical Evidence

In May 2011, Penland was evaluated by clinician Cathy Strack, M.S., L.M.H.C., and was administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). (Tr. 262-64.) He scored 63 in verbal comprehension, 75 in perceptual reasoning, 63 in working memory, 79 in processing speed, and a full-scale IQ of 65. (Tr. 263.) Ms. Strack stated that Penland's scores placed him in the mild mental retardation range and appeared to be a valid reflection of his intellectual functioning. (Tr. 263.) She concluded that he was "able to manage skills for daily living that include grooming, hygiene, and dress habits and routine household skills," but "displayed an inability to maintain satisfactory, long-term, or full-time employment that would allow him to become self-sufficient, due, in part, to his lack of arithmetic skills and ability to read." (Tr. 263.) Ms. Strack's report was countersigned by Kenneth Bundza, Ph.D. (Tr. 263.)

In June 2011, Kari Kennedy, Psy.D., a state agency psychologist, reviewed Penland's record and completed a psychiatric review technique and a mental residual functional capacity ("RFC") assessment. (Tr. 287-304.) On the psychiatric review technique, Dr. Kennedy

concluded that Penland had mild restrictions in activities of daily living and maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 297.)

On the mental RFC assessment, Dr. Kennedy found that Penland was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 301-02.) He was not significantly limited in the other fifteen mental activity categories. (Tr. 301-02.) After noting Penland's long work history, Dr. Kennedy concluded that while Penland may require some initial repetition for new learning, he "does appear capable of sustaining once learned." (Tr. 303.) She summarized:

> The totality of evidence in [the] file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; [and] able to deal with changes in a routine work setting. Cl[aiman]t appears capable of unskilled work.

(Tr. 303.) Dr. Kennedy's opinion was later affirmed by B. Randal Horton, Psy.D., a second state agency psychologist. (Tr. 305.)

### D.  Other Evidence

Penland's manager from the Dollar Tree submitted a written report stating that Penland had worked there several hours per week unloading trucks, cleaning floors, and stocking shelves. (Tr. 217.) She indicated that although he was a little slow in catching on to new instructions and

needed directions repeated, he was a reasonably good worker overall, was eventually allowed to train other employees, and Dollar Tree would rehire him. (Tr. 217.) She could not, however, assign him to the cash register because he made too many mistakes. (Tr. 217.)

Penland's wife submitted a written report stating that Penland takes care of the household chores, but does not cook; he does dishes at a slow pace and sometimes does not get them clean. (Tr. 216.) He needs instructions repeated several times. (Tr. 216.) He has difficulty counting change, cannot complete an application, and cannot use a password on a computer. (Tr. 216.) He is able to read a regular clock and drive a moped, but does not drive in unfamiliar places. (Tr. 216.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity ["SGA"] by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On September 27, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 19-31.) The ALJ noted at step one of the five-step analysis that Penland had engaged in SGA after his alleged onset date. (Tr. 21.) Specifically, the ALJ found that Penland's current job at Walmart would constitute disqualifying SGA, but that his work as a cook in a doughnut shop in 2011 and in unloading trucks at the Dollar Tree in 2010 did not. (Tr. 21.) Accordingly, the ALJ elected to proceed to step two, explaining that despite Penland's recent disqualifying work activity at Walmart, his earnings had been well below SGA levels for much of the period since his alleged onset date in January 2009, and thus, additional analysis was required. (Tr. 21.)

The ALJ found at step two that Penland's cognitive impairment and chronic obstructive pulmonary disease ("COPD") were severe impairments. (Tr. 22.) At step three, however, the ALJ concluded that his impairment or combination of impairments was not severe enough to meet a listing. (Tr. 22-25.) Before proceeding to step four, the ALJ determined that Penland's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [N]o limits in lifting, carrying, sitting, or standing; occasional walking; occasional climbing of ramps and stairs, and occasional climbing of ladders, ropes, and

scaffolds; must avoid even moderate exposure to fumes, odors, dusts, gases, and poorly ventilated areas; must avoid even moderate exposure to extreme cold, heat, and humidity; can understand, remember, and carry out simple instructions and work-like procedures; can concentrate long enough to complete simple tasks in a timely manner; can sustain a flexible or goal-oriented pace; can make simple work-related decisions; and, can tolerate superficial interaction with the public.

(Tr. 25.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Penland was unable to perform any of his past relevant work. (Tr. 29.) The ALJ then concluded at step five that Penland could perform a significant number of other jobs within the economy, including cleaner (maintenance), doorkeeper, and production line worker. (Tr. 29.) Therefore, Penland's claim for DIB and SSI was denied. (Tr. 30-31.)

*C. Substantial Evidence Supports the ALJ's Step-Three Finding
That Penland Did Not Meet or Equal Listing 12.05C*

Penland first argues that the ALJ erred in her step-three analysis by finding that he did not meet or equal a listing–specifically, Listing 12.05C, intellectual disability. Contrary to Penland's assertion, the ALJ's step-three conclusion is supported by substantial evidence.

Listing 12.05C provides in relevant part:

12.05 Intellectual Disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt P, App. 1 § 12.05.  "[T]he structure of Listing . . . 12.05 indicates that a claimant must show *both* that he meets the listing's definition of mental retardation *and* that he meets the required severity by satisfying the requirements in either A, B, C, or D." *Smallwood v. Astrue*, No. 2:08-cv-85, 2009 WL 2475272, at *8 (N.D. Ind. Aug. 11, 2009) (emphasis in original) (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)).

When boiled down, to meet Listing 12.05C, a claimant must show: (1) significantly subaverage intellectual functioning with deficits in adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full-scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Charette v. Astrue*, 508 F. App'x 551, 553 (7th Cir. 2013) (unpublished); *Adkins v. Astrue*, 226 F. App'x 600, 605 (7th Cir. 2007) (unpublished); *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *Anderson v. Astrue*, No. 4:10-cv-91, 2011 WL 4899990, at *5 (N.D. Ind. Oct. 14, 2011); *Smallwood*, 2009 WL 2475272, at *8.

The parties agree that Penland satisfies the latter two prongs of the Listing, as his WAIS-III testing in May 2011 revealed a full-scale IQ of 65, and the ALJ concluded at step two that his COPD was a severe impairment. *See Smith v. Colvin*, 9 F. Supp. 3d 875, 884 (E.D. Wis. 2014) (explaining that an ALJ's finding of a "severe" additional physical or mental impairment at step two satisfies the third prong of Listing 12.05C); *Washington v. Astrue*, No. 2:10-cv-367, 2012 WL 3108872, at *7 (N.D. Ind. July 31, 2012) (same).  The parties' dispute, rather, centers on Penland's ability to satisfy the first prong–significantly subaverage intellectual functioning with deficits in adaptive functioning prior to age twenty-two.

The Seventh Circuit Court of Appeals has explained that the term "deficits in adaptive

functioning" denotes an "inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 709 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV-TR)* 42 (4th ed. 2000)). "As the Seventh Circuit noted, '[i]f you cannot cope with those challenges, you are not going to be able to hold down a full-time job.'" *Youngblood v. Colvin*, No. 13-cv-209, 2014 WL 841528, at *3 (E.D. Wis. Mar. 4, 2014) (quoting *Novy*, 497 F.3d at 709). The Seventh Circuit does "not require an ALJ to use a specific measurement method" when assessing "deficits in adaptive functioning." *Charette*, 508 F. App'x at 553 ("Because the ALJ examined Charette's ability to cope with the challenges of daily life, she applied the correct legal standard.").

In analyzing Penland's adaptive functioning at step three, the ALJ explained:

> Although the claimant's attorney argued that the criteria of Listing 12.05C (Mental retardation) were met in his pre-hearing brief, at the hearing[] he acknowledged that the requisite deficits in adaptive functioning were *not* present given the claimant's work history. I agree.
>
> School records in evidence are difficult to read, but they appear to show that the claimant was performing satisfactorily, and the State Agency consultant noted that it appeared that special education was received only in the area of reading. Moreover, the claimant testified that he dropped out of school in the eighth grade in order to find work after his father was injured.
>
> Earnings records show that the claimant has maintained work at [SGA] levels, and although his attorney has suggested that the claimant received significant assistance in past work, this has not been objectively verified. The claimant has lived independently, he reported that he walks where he needs to go, and as noted, his employer reported that he was training another employee in June 2011.

(Tr. 25 (emphasis added and internal citations omitted).)

Ultimately, the ALJ concluded at step three that while Penland's deficits "likely affect activities of daily living to a certain extent, overall, the evidence establishes that limitations are

no more than mild." (Tr. 23.)  The ALJ observed that although testing confirmed a full-scale IQ in the mildly mentally retarded range, "the claimant has been able to successfully maintain unskilled work despite cognitive deficits in the past, and he was again employed at the time of the hearing." (Tr. 24.)  She acknowledged that while Penland's cognitive impairment would affect the type of work he could successfully perform, "it does not substantiate impairment that precludes him from performing simple work tasks." (Tr. 24.)

In addition, the ALJ revisited Penland's adaptive functioning later in her decision.  She observed that he is able to read traffic signs and notes from his wife; that his wife helped him out "at the beginning" of his factory job if he fell behind; and that he had been allowed to measure skids by the foot, rather than inches. (Tr. 26.)  The ALJ emphasized, however, that she did not find persuasive Penland's attorney's claim that Penland had relied heavily on others to "survive" in prior jobs. (Tr. 26.)

In challenging the ALJ's step-three finding, Penland advances several arguments in support of his claim that he meets the first prong of Listing 12.05C.  He begins by challenging the ALJ's statement that "[t]he record as a whole fails to support significantly subaverage intellectual functioning or deficits in adaptive functioning as required under the threshold criteria." (Tr. 25.)  Penland emphasizes that his full-scale IQ score fell within the required range for Listing 12.05C, and thus, that he has satisfied the "significantly subaverage intellectual functioning" portion of the prong.  Indeed, "a qualifying IQ score may be *prima facie* evidence that an applicant suffers from 'significantly subaverage general intellectual functioning.'" *Youngblood*, 2014 WL 841528, at *3; s*ee Anthony v. Astrue*, No. 1:10-cv-136, 2011 WL 2728059, at *6 (S.D. Ind. July 12, 2011) (finding that claimant's IQ scores satisfied both the IQ

score requirement in subparagraph C as well as evidence of "significantly subaverage general intellectual functioning" in the introductory paragraph of 12.05); *King v. Barnhart*, No. 1:06-cv-381, 2007 WL 968746, at \*5 (S.D. Ind. Feb. 26, 2007) (observing that IQ scores of 70 or below suggested significant deficits in intellectual functioning).

But "ultimately . . . there is no necessary connection between an applicant's IQ scores and [his] relative adaptive functioning." *Youngblood*, 2014 WL 841528, at \*3 (collecting cases). In regard to that portion of the prong, Penland, for the most part, simply urges the Court to reweigh much of the evidence that the ALJ examined when assessing his adaptive functioning, hoping that it will come out in his favor this time. This evidence includes that he was in special education, struggles with math and reading, made too many mistakes on the cash register at the Dollar Tree, could not measure skids to the fraction of an inch at his factory job, can only tell if he gets correct change at a store if it printed on the receipt, failed his driver's written exam, and relies on his wife to complete applications for him. (Opening Br. 8-9.)

The ALJ, however, did not ignore this evidence. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (explaining that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly). Rather, the ALJ fairly considered Penland's limitations in the context of the other evidence of record (*see* Tr. 25-28), including, most notably, Penland's work history and that he lived independently before marriage. The Court is not allowed to merely substitute its judgment for the ALJ by "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).

More specifically, Penland asserts that the ALJ mischaracterized the record when she

stated that he "has lived independently." (Tr. 25.) He asserts that "the record is clear that he needed assistance to function with what little independence he did," emphasizing that his sister helped to pay his bills and get money orders, and his family or landlord drove him places. (Opening Br. 9.) In that same vein, Penland points to statements from his wife that he washes dishes at a slow pace and does not always clean them completely, wanders off task 25% of the time, took several attempts to learn how to use their new washing machine, and needs her assistance with job applications. (Opening Br. 9.)

But again Penland's argument overreaches. The ALJ fairly considered Penland's limitations, including that he received minimal assistance from his family when he lived alone, and that he received minimal support from his wife at the time of the hearing. (Tr. 23, 26.) That is, "[t]he ALJ properly evaluated both [Penland's] limitations and his adaptive ability to overcome them, including his ability to reach out to [family] for help." *Charette*, 508 F. App'x at 554 ("But the ALJ identified the limitations Charette faces, such as difficulty remembering tasks and reading, and then discussed how he overcomes them well enough to live independently, manage household chores, take care of his pets, and socialize with other people."); *see Sherrod v. Astrue*, No. 10-c-451, 2011 WL 284349, at *12 (E.D. Wis. Jan. 25, 2011) (finding that plaintiff did not show deficits in adaptive functioning where she lived on her own, cared for herself and others, and managed household affairs with minimal assistance).

Next, Penland challenges the ALJ's reliance on his work history, arguing that "gainful employment is not proof positive of a lack of adaptive deficits." (Opening Br. 10.) He contends the ALJ improperly discounted his assertion that he relied upon significant assistance from

others to perform his past jobs, for the reason that "this has not been objectively verified."[5] (Tr. 25.) To dispute this point, Penland highlights the report from his supervisor at the Dollar Tree, indicating that he needed directions repeated, was a little slow in catching on to new instructions, and could not be assigned to the cash register. (Tr. 216.) But Penland fails to acknowledge that the report *also* stated he got along well with others, was always on time, was a reasonably good worker, was eventually asked to train others, and that the Dollar Tree would rehire him. (Tr. 216.)

And this information is consistent with other evidence of record, indicating that although Penland may need extra repetition or assistance to initially learn tasks, once learned he can adequately perform the tasks. (*See, e.g.*, Tr. 57 (reporting that "[i]n the beginning" of his factory job, he sometimes fell behind and his wife helped him install loose screws), 58 (explaining that although he could measure skids in number of feet at his factory job, he had trouble with fractions of an inch, so another worker instructed him to just add another board to the skid if it appeared "a little big"), 216 (stating that although it took Penland several attempts to learn how to operate a new washer, he could perform the laundry at basic settings).) Indeed, at the time of the hearing, Penland had already started a new job as a Walmart greeter thirty hours per week, never asserting that he had difficulty learning or performing the job's requirements. (Tr. 24, 29, 40, 45-46.)

Moreover, at the hearing the ALJ asked the VE whether unskilled jobs allow for a learning period. (Tr. 63.) The VE responded: "All the unskilled jobs allow for a training period

---

[5] Curiously, although Penland now argues that his work history supports his assertion that he satisfies the adaptive deficits prong of Listing 12.05C, his attorney acknowledged just the opposite at the hearing. (Tr. 39 ("I thought this might be a listing case, but after reviewing with him his last seven months of employment and looking at a couple other jobs he had, I think we would not meet the adaptive deficits leg of the 12.05C . . . .").)

and during that time it is expected may need to assist new employees [sic], but then they are expected to work . . . basically independently with some supervision." (Tr. 63.) The VE then agreed that the three jobs she had identified for a hypothetical individual with Penland's limitations, even if he required some initial repetition for new learning, would "still be suitable." (Tr. 63.) Accordingly, the ALJ's conclusion that Penland, once trained, could perform unskilled work without significant assistance from others is adequately supported by the record.

Furthermore, despite Penland's attempt to characterize it so, this is not a case where the claimant lacks a work history. Penland worked on-and-off for thirty-five years before applying for benefits; and his earnings exceeded SGA levels in 1984-86 and 1992-2000, and fell just below SGA levels in 2005-2006. (Tr. 181-85, 191); *see* Social Security Administration, *SGA*, available at http://www.socialsecurity.gov/OACT/COLA/sga.html (last visited Jan. 12, 2015).

Although some of Penland's positions were shorter term or for temporary services, he did hold at least two jobs for an extended length of time. (Tr. 181-83.) In that regard, he worked full-time as a factory worker in two different factories from 1996 to 2000 (Tr. 211), and as a janitor at a hotel for thirty hours a week from 2004 to 2009 (Tr. 47-49, 201, 244). Notably, Penland testified that he did not have any problems performing the janitorial job, but was let go when a new manager was hired and "got rid of a bunch of us" and "got people in there that she wanted." (Tr. 49.)

Therefore, Penland's work history also cuts against his assertion of adaptive deficits. *See Charette*, 508 F. App'x at 552-54 (concluding that claimant lacked deficits in adaptive functioning and adequately overcame his intellectual limitations where he lived independently, socialized with others, and worked shorter-term jobs obtained through family and friends); *see*

*also Adkins*, 226 F. App'x at 605 (concluding that the claimant failed to demonstrate deficits in adaptive functioning where he was gainfully employed until the age of forty-one without material complaints from his employers and the record contained only minimal evidence about his cognitive and medical state before age twenty-two other than his own testimony that he completed school only through the eighth grade); *Novy,* 497 F.3d at 710 (relying upon claimant's daily living activities, living circumstances, and work history when finding that she did not satisfy the adaptive deficits requirement of Listing 12.05(C)); *Witt v. Barnhart*, 446 F. Supp. 2d 886, 895-96 (N.D. Ill. 2006) (concluding that the claimant failed to exhibit deficits in adaptive functioning manifested prior to age twenty-two because of his eighteen-year work history, even though he suffered from learning disabilities and received poor marks in special education classes); *Cooper v. Massanari*, No. 00 C 8083, 2001 WL 1464930, at *8-9 (N.D. Ill. Nov. 15, 2001) (finding that although the claimant had taken special education classes and had only a ninth grade education, her work history and functional activities were ample evidence to support the ALJ's conclusion that she did not satisfy the adaptive deficits requirement of Listing 12.05C).

Furthermore, although they did not identify Listing 12.05, Drs. Kennedy and Horton, the state agency psychologists, concluded that Penland's mental impairment did not meet or equal any listing. (Tr. 287-305.)  The Seventh Circuit has stated that "[t]he ALJ may properly rely upon the opinion of these medical experts." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004 (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *3.

In sum, Penland has failed to carry his burden of showing that he satisfied all of the

criteria of Listing 12.05C.  Consequently, the ALJ's step-three finding that Penland did not meet or equal a listing will be affirmed.

### D.  The ALJ's Discounting of Ms. Strack's Opinion Is Supported by Substantial Evidence

In his second argument, Penland contends that the ALJ improperly rejected the May 2011 opinion of consulting examiner Ms. Strack (which was countersigned by Dr. Bundza), articulating that "Penland has displayed an inability to maintain satisfactory, long-term, or full-time employment that would allow him to become self-sufficient, due, in part, to his lack of arithmetic skills and ability to read." (Tr. 263.)  Contrary to Penland's assertion, the ALJ adequately articulated his reasons for rejecting this opinion, and his rationale for doing so is supported by substantial evidence.

An ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted).  An ALJ must consider a variety of factors when evaluating conflicting medical opinion evidence, "including whether a physician is a treating or examining physician; the length, nature and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion."[6] *Books*, 91 F.3d at 979 (citing 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d)).

Here, the ALJ penned an entire paragraph on Ms. Strack's opinion, acknowledging that the results of Penland's IQ testing placed him in the mild mental retardation range.  The ALJ

---

[6] The parties do not address whether Ms. Strack's opinion, countersigned by Dr. Bundza, should be considered an "other" source opinion under 20 C.F.R. §§ 404.1513(d) and 416.913(d) or an "acceptable medical source opinion" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 06-03p, 2006 WL 2329939.  Such a distinction, however, appears non-pivotal in this instance, as the ALJ did not discount the opinion on this basis.

considered Ms. Strack's observations that Penland provided good verbal responses, was well oriented during the evaluation, and that his mood was "positive and upbeat." (Tr. 28.) Ultimately, however, she rejected Ms. Strack's assertion that Penland "displayed an inability to maintain satisfactory, long-term, or full-time employment that would allow him to become self-sufficient" (Tr. 28 (quoting Tr. 263)), finding it "simply not true" (Tr. 28).

In doing so, the ALJ observed that the history section of Ms. Strack's evaluation discussed only Penland's job at the Dollar Tree unloading trucks several hours a week. That is, there was no mention of his other jobs throughout the years, most notably, his four years of full-time factory work or his five years of janitorial work at thirty hours per week. The ALJ emphasized that the record reflected that Penland had successfully overcome his intellectual deficits in the past to perform these jobs, and, in fact, had found appropriate employment as a Walmart greeter by the time of the hearing.[7] (Tr. 29.) The ALJ then inferred, and reasonably so, that Ms. Strack was unaware of Penland's entire work history. *See Stevenson*, 105 F.3d at 1155 (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him). Accordingly, she credited the opinion of Drs. Kennedy and Horton, the state agency psychologists, who reviewed Penland's record and found him capable of unskilled work, *see* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychologist consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical experts who are also experts in Social

---

[7] Indeed, the Seventh Circuit has acknowledged that "persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job." *Novy*, 497 F.3d at 709 (collecting cases). "Their employment opportunities are of course limited." *Id.* (citation omitted). "But the social security disability program is not an unemployment-benefits law." *Id.*

Security disability evaluation."), over the consulting opinion of Ms. Strack and Dr. Bundza.[8] (Tr. 28-29.)

Ultimately, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Here, the ALJ fulfilled her role, minimally articulating her rationale for the weight she assigned to the various opinions of record. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (emphasizing that an ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability," describing this as a "lax standard"). The Court can ask no more of the ALJ and will not reweigh the evidence at this juncture. Therefore, the Commissioner's final decision will be AFFIRMED.

## V. CONCLUSION

For the reasons articulated herein, Plaintiff's Motion to Strike Defendant's Amended Memorandum in Support of the Commissioner's Decision (Docket # 23) is DENIED, and the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor

---

[8] Penland also challenges Dr. Kennedy's narrative comment stating that Penland has a long work history "suggestive of unskilled and semiskilled (line worker, bartender)" work. (Tr. 303.) He emphasizes that the VE concluded at the hearing that his past "bartender" job (Tr. 211) was actually that of a doorkeeper (Tr. 59), and as such, was unskilled work. Penland's nitpick, however, is unpersuasive. *See Rice*, 384 F.3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). The ALJ limited Penland to unskilled, not semiskilled, work; and Dr. Kennedy provided at least five other reasons in addition to Penland's work history why she found him capable of performing unskilled work. (*See* Tr. 303.)

of the Commissioner and against Penland.

SO ORDERED.

Enter for this 14th day of January 2015.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge